[No. 29125. Department Two. November 10, 1943.]

VANCE LUMBER COMPANY, *Appellant*, v. TALL'S TRAVEL SHOPS, INC., *Respondent*.[1]

*Shank, Belt, Rode & Cook,* for appellant.

*Monheimer & Schermer,* for respondent.

MILLARD, J.—This action was instituted by plaintiff lessor to recover against defendant lessee alleged unpaid rental. Plaintiff alleged that, in September, 1939, plaintiff, a domestic corporation, leased to defendant domestic corporation space in the Joseph Vance building in Seattle for the term of ten years from May 1, 1940, to and including April 30, 1950. By that lease the defendant was obligated to pay to the lessor a minimum monthly rental of $750. The contract further provided that:

"In the event that all of the gross receipts from retail sales during any calendar month for both stores shall exceed the

[1]Reported in 142 P. (2d) 904.

sum of $9375.00, then and in that event the lessee hereby agrees to pay in addition to the aforesaid minimum monthly guaranteed rental a sum equal to 8% of said gross receipts in excess of said $9375.00."

Defendant answered, admitting execution of the contract as alleged by plaintiff, and, as an affirmative defense, pleaded that the parties mutually executed a modification of the rental provision of the lease and that it is not indebted to plaintiff in any sum whatsoever.

Defendant further pleaded that it was induced to change its business from a cash to a credit and installment basis by reason of the terms, with which it complied, of the lease modification agreement which reads as follows:

"It is hereby understood and agreed that amendments be made to that certain lease between the Vance Lumber Company, Lessor, and Tall's Travel Shops, Inc., Lessee, dated September 11, 1939.

"Up to the present time Lessee has been operating on what is known as a strictly cash basis. However, it is now Lessee's desire and request to change over on July 1, 1941, to a credit and installment basis.

"The Lessor hereby agrees to amend lease accordingly and further agrees that item 'C', Paragraph 19, be canceled and rewritten as follows:

" 'In the event that all of the gross receipts from retail sales, by cash or credit, made during any calendar month shall exceed the sum of $12,500.00 then and in that event the Lessee hereby agrees to pay in addition to the minimum monthly guaranteed rental a sum equal to:   ·

" '(a)  Six per cent on gross sales between $12,500.00 and $20,000.00.

" '(b)  Five per cent on gross sales between $20,000.00 and $25,000.00.

" '(c)  Four per cent on gross sales over $25,000.00.'

"For and in consideration of Lessor consenting to this change and reduction in rental percentage, it is hereby understood and agreed that Lessee will start at once toward putting the store on a credit basis; that new lines of merchandise such as electrical refrigerators, washing machines and various electrical appliances will be added to the now present stock; that he will establish a credit department; that all merchandise in his store will be available for pur-

chase on credit basis; that all advertising by radio, newspapers, etc., will be toward developing a credit business. In other words, the Lessee will devote his time and best interests toward changing from cash to credit basis in such a manner that Tall's Travel Shops, Inc., will soon be known as a store selling on the credit and installment basis.

"Except as so modified, said lease shall remain in full force.

"Dated this 7th day of June, 1941.

"TALL'S TRAVEL SHOPS, INC.  VANCE LUMBER COMPANY,

"By Harry Tall                By Lloyd J. Vance
   Pres.                                    President"

By its reply, plaintiff alleged that the lease modification agreement was void for the reason that it was not acknowledged as required by the statute (Rem. Rev. Stat., § 10618 [P. C. § 3553]); that the execution of the modification agreement by plaintiff was induced by false representation of defendant's president; and that, as defendant had failed to do any of the things which were recited as consideration for the execution of the modification agreement, there was a failure of consideration for the modification agreement.

Trial of the cause to the court resulted in findings, so far as pertinent, as follows:

"That thereafter the defendant complied with the terms of the 'Lease Modification Agreement' in the following particulars:

"1. Defendant employed architects to draw plans to remodel the leased premises.

"2. Defendant employed contractors to remodel the said leased premises, paying a bonus to said contractors for speedy completion of the contract.

"3. Defendant employed Sol Herman, Attorney at Law, to advise defendant relative to the setting up of a credit system, and to draw for defendant a form of *continual* sales contract.

"4. Defendant caused to be printed 500 card sales contracts.

"5. Defendant purchased new lines of merchandise and enlarged the lines of merchandise he previously had.

"6. Defendant left for a buying trip to the Eastern markets to purchase additional merchandise.

"7. Defendant arranged for an increase of credit at the Seattle First National Bank to $25,000.00.

"8. Defendant placed all sales girls on full commission on all sales.

"9. Defendant changed its advertising policy from one of cash to one of credit in all advertising mediums, including newspapers, Shopping News, and radio.

"10. Defendant attempted to obtain from General Electric Supply Corporation radios, washing machines, and refrigerators and other electrical appliances.

"11. That after the execution of the modification agreement the defendant advertised twice weekly in the Shopping News.

"12. That all of the foregoing were done by the defendant after the execution of the Lease Modification Agreement.

"That defendant entered into said Lease Modification Agreement in good faith, and in good faith has performed its said agreement; that no evidence of fraud on the part of the defendant, or its officers, was produced."

Consonant with the foregoing findings, the trial court concluded that the action should be dismissed and judgment was entered accordingly.

Counsel for appellant contend that the modification agreement is void for lack of acknowledgment (at least from November 25, 1941, when appellant gave written notice to respondent of repudiation of the modification agreement), and that there has not been a sufficient part performance by respondent of the defective modification agreement to remove that contract from the statute of frauds and authorize a court of equity to decree specific performance of the agreement.

Appellant insists that, as an unacknowledged lease under the statute (Rem. Rev. Stat., § 10618), like an oral lease, only creates a tenancy of month to month, an agreement to modify a written and properly acknowledged lease is invalid unless acknowledged.

In *Hansen v. Central Inv. Co.*, 10 Wn. (2d) 393, 116 P. (2d) 839, we held that the agreement to modify the rental provision of a two-year lease of premises was invalid under

Rem. Rev. Stat., § 10618, which provides that leases "shall be valid for any term or period not exceeding one year without acknowledgment, witnesses, or seals," for the reason that the modification agreement had not been acknowledged before a notary public.

In *City Mortgage Co. v. Diller*, 180 Wash. 499, 40 P. (2d) 164, we held that a lease required by law to be in writing cannot be modified by parol, except so far as agreement has become executed; that is, a lessor is bound by a parol agreement modifying the covenant to pay rent contained in a lease required by law to be in writing only in so far as such oral agreement has become executed. It is a statutory (Rem. Rev. Stat., § 10618) prerequisite to creation of a tenancy of real estate for a longer period than from month to month that the lease be acknowledged before a notary public. It follows that such contract may not be modified by a written agreement, unless the modification agreement is acknowledged.

■  However, in so far as such unacknowledged agreement to modify the contract required by law to be acknowledged has been executed, the parties to the lease and modification agreement are bound thereby. In *Garbrick v. Franz*, 13 Wn. (2d) 427, 125 P. (2d) 295, we held that an unacknowledged lease has no more force than an oral lease, but that a sufficient part performance by the lessee of the covenants contained in the defective lease agreement removed the contract from the statute of frauds and authorized a court of equity to decree specific performance of the agreement by the lessor. We said:

"The exception to the statute of frauds, which compels a lease of real estate for more than one year to be in writing and requires it to be acknowledged by the lessor, rests upon the principle that a court of equity will not allow the statute to be used to perpetrate a fraud. The test as to whether the exception applies may be found in answer to the question: Have the acts of one of the parties changed his situation to such an extent that he cannot be adequately compensated in damages or placed in his original position? If

the party should be put in that position, the contract, though otherwise void, may be enforced in equity."

The judgment may not be affirmed unless there has been a sufficient part performance by respondent lessee of the obligations enjoined in the modification agreement to remove that contract from the statute of frauds and authorize a court of equity to decree the specific performance of the agreement by appellant lessor.

By letter dated November 25, 1941, appellant notified respondent of former's repudiation of the modification agreement quoted above as there was an absence of "evidence of any effort on your part to live up to your agreement contained in the modification." Counsel for respondent contend that, with the exception of two items, "such as refrigerators and washing machines," respondent performed every act required by the modification agreement; that there was no definite statement that refrigerators and washing machines would be installed and that the failure to install those two items was made impossible by the limitations on manufacturing created by the preparedness program in participation of the then imminent war.

It was the purpose of the modification agreement to change respondent's business from a cash to a credit business in such a manner that respondent's store would soon be known as a store selling on the credit and installment basis. By such conversion, it was contemplated that the gross receipts would increase and in prosperous times the landlord would receive a larger rental, while in a less profitable era the landlord would share a portion of the tenant's burden in the nature of a decreased rental.

The trial court found that respondent employed architects to draft plans for remodeling the leased premises and employed contractors to whom it paid a bonus for speedy completion of the contract. In June, 1941, the parties entered into the modification agreement. It was not until September that respondent employed an architect and a contractor to remodel respondent's store for the accommodation of an increased amount of goods. It appears from the evi-

dence that the goods to be accommodated were not the new line of large articles, such as electrical refrigerators and washing machines which respondent had bound itself to add to its new lines of merchandise, but that the remodeling was necessary for the display of small items which respondent was adding to its lines of merchandise. It is fairly inferable that the bonus received by the contractor was paid to him because respondent had delayed for three months commencement of the alterations.

The trial court found that respondent retained a certain attorney to advise respondent respecting the installation of a credit system and to draft for respondent a form of sales contract and that respondent caused to be printed five hundred card sales contracts.

The attorney retained by respondent was at the time of his employment by respondent, and three years prior thereto, assistant secretary of a well-known business house in Seattle whose cash sales were only ten per cent of its total business, which attorney was in charge of the credit and collection department of that store. That respondent's president was conversant with the merchandising methods of the business house, of which the attorney mentioned was assistant secretary, is clear from the record. Respondent's president informed the representative, who handled negotiations for appellant with respondent, that he knew some one in the business house of which the attorney mentioned above was assistant secretary who would give respondent all necessary information respecting the installation of a credit department. It is likewise clear that respondent's officers had in mind a publicity campaign and business methods like those of the business house of which the attorney was assistant secretary.

The assistant secretary and attorney of that business house testified that, if an organization did not do any more than approximately ten per cent credit business, it was primarily a cash store. The general supervisor of the finances and accounting procedure of the business house which was the one the respondent had in mind when contemplating installation of the credit business testified it would be

normal to expect at least thirty per cent to forty per cent of respondent's business would be credit business if respondent intended to go into a thirty-day accounting business, but that, if respondent contemplated an installment type of operation, "it could be anything from 40% up to 75 or 80%." He also testified that any sales under ten per cent would not be considered as being in the credit business.

Respondent had twenty-five hundred contracts and cards printed. It is admitted that, from July 1, 1941, to September 30, 1942, only five hundred and thirty-eight contracts were used, or a monthly average of approximately thirty-six contracts. From July 1, 1941, to November 30, 1941, respondent made one hundred and fifty-five such sales aggregating thirty-four hundred dollars, and during the same period the total sales of respondent were sixty-one thousand dollars; that is, the conditional sales during this period were less than six per cent of the total sales. In July, the conditional sales were nearly six per cent, while in November they were a trifle over four per cent of the total sales. In September, 1942, the conditional sales were less than five per cent of the total sales. On April 30, 1942, a total amount of credit accounts on respondent's books was $960, of which $527 had been placed there within the preceding month; and only $157 was older than three months.

According to the testimony of witnesses, particularly that of the credit manager of the installment credit house whose program respondent desired to follow, if respondent had sincerely desired to convert his business from a cash to a credit business, respondent's credit business would in three or four months have amounted to thirty per cent of its entire business and in a year it should have been seventy-five or eighty per cent of its entire business. This witness answered in the negative the question whether a store which in April, 1942, had gross sales of sixteen thousand dollars and had on its books a credit of $960 could be considered as doing a credit business. The record is clear that the parties had in view the approximation of a goal comparable,

so far as was possible, with the installment credit business of the store of which respondent's attorney was assistant secretary, and that it was anticipated, of course, that the installment business would far exceed the volume of the cash business. The additional overhead from the beginning of negotiations between the parties for modification of the lease until repudiation by appellant of that agreement was not substantially because of, nor in compliance with, the modification agreement.

The trial court further found that, in compliance with the terms of the modification agreement, respondent purchased new lines of merchandise, enlarged the lines of merchandise it previously had; that its president departed for a buying trip to eastern markets to purchase additional merchandise; and that respondent arranged for an increase of its credit at a local bank to twenty-five thousand dollars. In its written communication to appellant in April, 1941, which clearly was intended as a basis for the negotiation of a reduced rental, respondent stated that it had found it difficult to do business under its present set-up and that it had been compelled to reduce its advertising business to one-half, which from experience it knew would react unfavorably on its sales value in the future. When this letter was written, respondent's business had increased to such an extent that respondent doubtless anticipated a further increase in the near future. Respondent's inventory had increased during 1940 about twenty-five per cent. In the first three months of 1941, respondent's purchases of merchandise aggregated fifteen thousand dollars, or an increase of fifteen hundred dollars more than its purchases during the first three months of 1940. The increase in purchases negatives the statement that respondent anticipated a slump in business.

Respondent's president made a trip in August, 1941, for the purpose of buying merchandise. It appears, however, that he made such a trip in February, 1941, and also made a like trip in January, 1940. He also made two business buying trips in 1942, subsequent to the commencement of

this action. Three of the four trips made by respondent's president cannot have had aught to do with the execution of the modification agreement; that being so, it cannot be reasonably inferred that the buying trip in August, 1941, was made by respondent's president because or in furtherance of the modification agreement of June, 1941.

The new lines of goods, which respondent was obligated by the modification agreement to add to its present stock, were not added. The total purchases of new lines of goods from June to November, 1941, amounted to five thousand five hundred dollars. The total purchases of respondent during that period amounted to seventy-seven thousand dollars, as compared with purchases of forty-four thousand dollars during the same months in the year 1940. Many of the articles listed as new are simply new makes of lines of goods which respondent previously carried, such as cameras, pens, umbrellas, etc. In the case of the line of small electric goods purchased from a local supply house, those purchases were small and were frequently repeated as the demand required.

In December, 1941, which was subsequent to appellant's repudiation of the modification agreement, respondent purchased radios aggregating in excess of sixteen hundred dollars. Respondent has not added to its stock electrical refrigerators and washing machines. True, respondent's sales have greatly increased but it is a fact of which we may take judicial notice that sales during the past two years have greatly increased and that these conditions have inured to the benefit of respondent; that nothing was done by respondent to add new lines of merchandise and to establish an installment credit program to which could be ascribed the increase in sales.

Respondent's increase of credit at a local bank to twenty-five thousand dollars does not represent a loan utilized to add as new lines of merchandise refrigerators and washing machines, nor was this loan used in complying with the terms of the modification agreement. There is no showing that respondent had any difficulty in negotiating or paying

the loan; in fact, rather than any detriment to respondent there was no sacrifice on its part in borrowing the money out of which it profited materially. Five thousand dollars of the loan was borrowed subsequent to the date of appellant's notification to respondent of repudiation of the modification agreement. The loan was increased in January, 1942, and additional loans in excess of thirteen thousand dollars were negotiated in 1942, all subsequent to appellant's repudiation of the modification agreement. In September, 1942, respondent owed on this loan only ten thousand dollars or the same amount which it owed in January, 1941. From this it is patent that the loans were not made to effect the purpose of the modification agreement, and it is likewise clear that respondent has not suffered harm by reason of its borrowing. Respondent's inventory at the close of 1941 was ninety-nine thousand dollars. At the close of September, 1942, the inventory had increased to two hundred five thousand dollars. That is, the inventory had increased more than one hundred per cent in the period of nine months while this action was pending. We are convinced by the record before us that the purchases in the fall of 1941 were not made other than in anticipation of increased business demand and that the purchases were not made to comply with respondent's obligation under the modification agreement.

Another finding from which the trial court concludes that respondent satisfied the terms of the modification agreement is that respondent placed all of its sales girls on full commission on all sales. Whether this increased the wages of the sales girls the evidence does not disclose; however, it is likely that the wages were increased. The greatly increased business of respondent, which is not attributable to its performance of the conditions of the modification agreement, may have required that the wages of the sales girls be increased in view of the labor shortage. What relationship the placing of the sales girls on full commission on all sales has to do with the performance of the modification agreement, we are not informed.

The trial court found that respondent changed its advertising policy from one of cash to one of credit in all advertising mediums including newspapers, shopping news, and radio; that respondent endeavored to obtain, from the corporation controlling the sale of same, radios, washing machines, refrigerators, and other electric appliances; and that, after the execution of the modification agreement, respondent advertised twice weekly in the shopping news.

From June 1 to December 1, 1941, there is an absence of evidence that respondent advertised its willingness to sell its merchandise on an installment basis (appellant, it should be borne in mind, repudiated the modification agreement in November). The statements of "Credit gladly" and "A deposit of $1.00 will hold a piece of merchandise until Christmas," or "Now say 'charge it' at Tall's" does not establish the fact that respondent was selling its merchandise on installment basis. The finding that, after the execution of the modification agreement, respondent advertised twice weekly in the shopping news, is true; however, respondent advertised in the shopping news prior to the execution of the modification agreement. Clearly, the advertising in the shopping news in no sense constitutes a part performance of the contract on the part of respondent. It is clear from the record that there was no additional advertising on the part of respondent, as a result of the modification agreement of June, 1941. There is no showing of any increase in expenditure for radio advertising.

A salesman of the corporation from which radios, washing machines, refrigerators, and other electric appliances would have been purchased testified that, prior to June or July, respondent was "buying all that we could sell to them at the time." The salesman further testified that he had first met respondent's representative in October, 1940, after which time respondent endeavored to purchase refrigerators from that witness' company. After July 1, 1941, respondent made no renewal of its attempts to purchase those refrigerators from that company.

Patently, for some months prior to the date respondent

and appellant executed the defective modification agreement under which respondent was obligated to add to its stock a line of electrical refrigerators and washing machines, respondent knew that it could not obtain those articles from the exclusive local agency therefor. There is no evidence that respondent ever attempted to obtain those articles from any other company or agency. The reason respondent could not obtain those articles from the agency in question was respondent's refusal to comply with the agency terms of a minimum purchase with which to begin. At the time of the execution of the modification agreement respondent was aware of the terms under which it could obtain the stock which it never added.

There was not a sufficient part performance by respondent of the covenants contained in the defective modification agreement to remove that agreement from the statute of frauds and authorize a court of equity to decree the specific performance of the agreement by appellant lessor. Conceding, *arguendo*, that the lack of acknowledgment did not vitiate the modification agreement, respondent has failed to perform the conditions of his contract; hence, appellant would be entitled to cancel same.

The judgment is reversed and the cause remanded, with direction to the trial court to enter judgment in favor of appellant for the amount of rent which is now due.

SIMPSON, C. J., BLAKE, ROBINSON, and MALLERY, JJ., concur.

January 17, 1944. Petition for rehearing denied.